**K–2 CORPORATION, Plaintiff–Appellant,**

v.

**SALOMON S.A. and Salomon/North America, Inc., Defendants–Appellees.**

**No. 98–1552.**

United States Court of Appeals, Federal Circuit.

Sept. 13, 1999.

Rehearing and Rehearing En Banc Denied Nov. 5, 1999.

Paul L. Gardner, Chrintensen O'Connor Johnson & Kindness PLLC, of Seattle, Washington, argued for plaintiff-appellant. With him on the brief were James R. Uhlir and Lawrence D. Graham.

Steven E. Lipman, Oblon, Spivak, McClelland, Maier & Neustadt, P.C., of Arlington, Virginia, argued for defendants-appellees. With him on the brief was James J. Kulbaski.

Before CLEVENGER, RADER, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge RADER.

CLEVENGER, Circuit Judge.

K–2 Corporation appeals the summary judgment of noninfringement granted in favor of Salomon S.A. and Salomon/North America, Inc., by the United States District Court for the Western District of Washington. *See K–2 Corp. v. Salomon S.A.,* 1998 WL 1032110, 50 USPQ2d 1054 (W.D.Wash.1998). The district court, after construing the disputed claim terms in K–2's reexamined United States Patent No. 5,437,466, determined that no reasonable jury could find that the accused product—Salomon's model "TR" in-line skate—infringed the asserted patent either literally or under the doctrine of equivalents. *See id.* at 1057. Because we conclude that the district court correctly interpreted the relevant claim language and properly determined that the doctrine of equivalents could not be used to reach the accused device, we affirm.

I

A

K–2 Corporation ("K–2") is the owner of reexamined U.S. Patent No. 5,437,466 ("the '466 patent"), issued August 1, 1995, entitled "In–Line Roller Skate." The '466 patent is generally directed to an in-line skate that has a soft, pliable inner "bootie" or "shoe" surrounded in certain areas by molded plastic or straps affixed to the base of the skate. This arrangement allows the wearer's foot to breathe and offers a substantially lighter skate while retaining structural stiffness required for performance.

**Figure 1, '466 Patent**

Claims 1, 5, and 6 of the '466 patent are the only claims at issue in this case. Representative claim 1 recites five major claimed components, as set forth in brief form below with the key limitation underlined:

1. In an in-line roller skate having an upper shoe portion and a lower frame portion ... a non-rigid shoe portion adapted to receive and substantially enclose the entire foot of the skater ... support means positioned adjacent selected areas of said non-rigid shoe portion for providing support to aid the skater in maintaining said in-line roller skate in a substantially vertical position ... and a base portion, ... *said non-rigid shoe portion being permanently affixed to said base portion at least at said toe area and said heel area for substantially preventing movement therebetween at least in a horizontal plane,* wherein at least a portion of said non-rigid shoe portion extends continuously from said base portion to at least the top of said ankle support cuff.

Claims 5 and 6 contain what the parties agree is equivalent language with respect to the key limitation:

5. ...
   *said non-rigid shoe portion being permanently interconnected with said base portion at least at said toe area and said heel area for substantially*

*preventing movement therebetween at least in a horizontal plane . . .*

6. ...

*said non-[rigid] upper portion being non-removably affixed to said rigid base adjacent both said heel and toe portions of said base for substantially preventing movement therebetween at least in a horizontal plane . . .*

Salomon S.A. and Salomon North America (collectively, "Salomon") make and sell an in-line skate, designated as model TR, that includes a soft inner bootie surrounded by a rigid plastic structure ("the TR skate"). The TR skate's inner bootie is fastened to the lower, rigid portion of the skate by the use of rivets and a screw in the toe area and by a removable hex-head screw in the heel area. The parties agree that the dispositive issue in this case is whether the use of a removable screw in the heel area of the TR skate can meet the "permanently affixed" limitation found in claims 1, 5, and 6 of the '466 patent.

**Salomon's TR Skate: Bootie/Base Attachment Detail**

B

In April 1998, K–2 sued Salomon for infringement of the '466 patent. On cross-motions for summary judgment, the district court rejected K–2's arguments that the disputed "permanently affixed" claim limitation should be construed to be synonymous with "affixed," "secured," or "firmly held," and instead held that the ordinary meaning of "permanently affixed" could not encompass the removable screw used in the heel area of the TR skate. *See K–2 Corp. v. Salomon S.A.,* 1998 WL 1032110, 50 USPQ2d 1054, 1056 (W.D.Wash.1998). The court determined that because the TR skate was missing an element of the '466 patent claims, it could not, as a matter of law, literally infringe those claims. *See id.*

The district court also held that the TR skate could not, as a matter of law, infringe under the doctrine of equivalents because of prosecution history estoppel. See id. at 1057. The court concluded that in amending the relevant claims during prosecution and examination to add the "permanently affixed" limitation and the heel and toe locations of the fastening, K–2 had relinquished coverage of in-line skates that did not have a bootie permanently affixed at both the heel and the toe. See id. The court further noted that the relevant prosecution history suggested that K–2 amended the claim to avoid a prior art reference, U.S. Patent No. 5,331,752 to Johnson ("the Johnson reference"), that. discloses an in-line skate in which the bootie is removable and affixed at the toe and mid-foot. See id. The district court concluded that K–2's relinquishment of such subject matter prevented it from now asserting that the heel screw of Salomon's TR skate was equivalent to the "permanently affixed" limitation of the '466 claims. Summary judgment of noninfringement was granted in favor of Salomon. See id.

K–2 appeals that decision, vesting this court with jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## II

We review the grant of summary judgment de novo. See Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). In doing so, we must keep in mind that summary judgment is appropriate only if there is no genuine issue of material fact. See Fed.R.Civ.P. 56(c). To this end, the court must draw all reasonable factual inferences in favor of the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent. See Renishaw PLC v. Marposs Società per Azioni, 158 F.3d 1243, 1247–48, 48 USPQ2d 1117, 1120 (Fed.Cir.1998); General Mills, Inc. v. Hunt–Wesson, Inc., 103 F.3d 978, 981, 41 USPQ2d 1440, 1442 (Fed.Cir.1997); Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 112 F.3d 1137, 1141, 42 USPQ2d 1589, 1592 (Fed.Cir.1997). See also Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172–73 (Fed.Cir. 1998) (en banc).

Because the relevant aspects of the accused device's structure and operation are undisputed in this case, the question of whether Salomon's TR skate literally infringes the asserted claims of the '466 patent turns on the interpretation of those claims. See Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578, 37 USPQ2d 1365, 1370 (Fed.Cir.1996) ("Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over [claim interpretation], the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment.").

■ We begin, of course, with the language of the claims. See Renishaw, 158 F.3d at 1248, 48 USPQ2d at 1120; Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023, 43 USPQ2d 1545, 1548 (Fed. Cir.1997); Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 619–20, 34 USPQ2d 1816, 1819 (Fed.Cir.1995). The general rule is that terms in the claim are to be given their ordinary and accustomed meaning. See Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 989, 50 USPQ2d 1607, 1610 (Fed.Cir.1999); Renishaw, 158 F.3d at 1249, 48 USPQ2d at 1121; York Prods., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir. 1996). That is, the ordinary and accustomed meaning of a disputed claim term

is presumed to be the correct one, *see Johnson Worldwide*, 175 F.3d at 989, 50 USPQ2d at 1610, subject to the following. First, a different meaning clearly and deliberately set forth in the intrinsic materials—the written description or the prosecution history—will control. *See id.*; *In re Paulsen*, 30 F.3d 1475, 1480, 31 USPQ2d 1671, 1674 (Fed.Cir.1994); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387–88, 21 USPQ2d 1383, 1386 (Fed.Cir.1992); *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 888–89, 221 USPQ 1025 (Fed.Cir.1984). Second, if the ordinary and accustomed meaning of a disputed term would deprive the claim of clarity, then further reference must be made to the intrinsic—or in some cases, extrinsic—evidence to ascertain the proper meaning. *See Johnson Worldwide*, 175 F.3d at 990, 50 USPQ2d at 1610–11. In either case, a party wishing to alter the meaning of a clear claim term must overcome the presumption that the ordinary and accustomed meaning is the proper one, demonstrating why such an alteration is required. *See Johnson Worldwide*, 175 F.3d at 989–90, 50 USPQ2d at 1610.

■ Here the critical claim language is "permanently affixed." The parties agree that the relevant language in claims 5 and 6 is equivalent, and there is no dispute about the meaning of "affixed" in this context. Thus, our analysis begins with the ordinary and accustomed meaning of the term "permanently" in the phrase "permanently affixed." The ordinary and accustomed meaning of this phrase, as the district court noted, *see K–2*, 50 USPQ2d at 1056, does not encompass affixation via removable screw. That is, the ordinary and accustomed meaning of "permanently affixed" in this context requires that the fastening be unremovable.

■ K–2's primary argument is that the functional language in the claim following this limitation—"for substantially preventing movement therebetween at least in a horizontal plane"—dictates the meaning of "permanently affixed." That is, K–2 suggests that the inclusion of this functional language converts the meaning of "permanently affixed" to mean "affixed to prevent movement in at least a horizontal plane." We cannot accept this reading of the claim. The functional language is, of course, an additional limitation in the claim. *See, e.g., Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443–44, 43 USPQ2d 1837, 1840 (Fed.Cir. 1997) (functional language analyzed as a claim limitation). This limitation requires that the attachment between the bootie and the base "substantially prevent[ ]" movement of the bootie (and presumably, the user's foot when inserted in the bootie) in a horizontal plane. In other words, the functional language requires that the attachment prevent the bootie from sliding around on top of the base; it demands a structural rigidity in the horizontal dimension to the connection between the bootie and the base. It also, as K–2 correctly notes, may be accomplished with an attachment that is easily removable, or at least something less than permanent. But it is undeniable that this language is fully consistent with a permanent attachment as well. That is, the functional language tells us something about the structural requirements of the attachment between the bootie and the base; it speaks not at all, however, about whether that attachment is permanent, something less than permanent, or entirely removable. The only answer to *that* question, of course, is the specific claim limitation that the bootie be "permanently affixed" to the base. K–2 reads the functional language in a way that would effectively expunge the term "permanently" from the claim language. *Cf. Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 n. 8, 3 USPQ2d 1321, 1325 n. 8 (Fed.Cir.1987) ("[S]pecific claim limitations can[not] be ignored as insignificant or immaterial in determining infringement."). A more natural construction reads the two clauses as complementary, recognizing that "permanently affixed" requires an unremovable attachment, while the functional language requires that the attachment prevent slid-

ing. *See, e.g., Renishaw,* 158 F.3d at 1250, 48 USPQ2d at 1122 (Fed.Cir.1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

While the claim itself provides no reason to alter the ordinary and accustomed meaning of "permanently affixed," K–2 may (and does) argue that the intrinsic evidence clearly sets forth an alternate definition. *See Beachcombers v. Wilde-Wood Creative Products, Inc.,* 31 F.3d 1154, 1158, 31 USPQ2d 1653, 1656 (Fed. Cir.1994) ("As we have repeatedly said, a patentee can be his own lexicographer provided the patentee's definition, to the extent it differs from the conventional definition, is clearly set forth in the specification."); *Hoganas AB v. Dresser Industries, Inc.,* 9 F.3d 948, 951, 28 USPQ2d 1936, 1938 (Fed.Cir.1993) ("Although a patentee can be his own lexicographer, as we have repeatedly said, the words of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently" (internal quotations omitted).). In particular, K–2 points to amendments and arguments made in support of patentability over the prior art Johnson skate. There, the applicant stated that the addition of the term "permanently" served to distinguish the claims from the "detachable" boot disclosed in Johnson. The applicant further argued that an advantage of the permanent connection was that it avoided the sliding heel the applicant noted as a problem with the prior art. From these passages, K–2 draws a conclusion similar to that outlined above: that "permanently affixed" must mean simply "affixed to prevent sliding in a horizontal dimension." We reject this conclusion: the proposed definition of "permanently" as "preventing sliding in a horizontal dimension" does not appear with the required clarity, deliberateness, and precision to impart an unaccustomed meaning to an otherwise clear claim term. *See In re Paulsen,* 30 F.3d at 1480, 31 USPQ2d at 1674 ("Although an inventor is

indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision."); *Hoganas,* 9 F.3d at 951, 28 USPQ2d at 1938–39 (finding patentee's proposed definition unsupported in the specification or prosecution history). Nowhere in the passages cited to us does the applicant squarely describe the nature of the connection (*i.e.,* "permanently affixed") in the pending claims. Instead, the relevant language focuses on the connection in the prior art Johnson skate ("detachable") and the advantages provided by the "permanently affixed" connection. K–2 therefore asks that we infer that the distinctions the applicant draws between the "detachable" boot in the prior art and the "permanently affixed" connection required by the claims constitute a clear explication of an unaccustomed definition of the term "permanently." We decline, however, to adopt a proffered unaccustomed meaning with so little support in the intrinsic record. *See In re Paulsen,* 30 F.3d at 1480, 31 USPQ2d at 1674 ("The specification merely describes in a general fashion certain features and capabilities desirable in a portable computer. This description, however, is far from establishing a specialized definition [of computer].").

■ To be sure, the prosecution history indicates that the applicant intended to amend the claims to avoid the "detachable" connection of the Johnson skate. The same history, however, indicates that the applicant chose to add the term "permanently" to the claims in order to achieve this result. That the applicant could possibly have added terms other than "permanently" to create a patentable distinction with the asserted prior art is simply irrelevant to our claim construction task. Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee. *See, e.g., Texas Instruments Inc. v. International Trade Comm'n,* 988 F.2d 1165, 1171, 26 USPQ2d 1018, 1023 (Fed.Cir.1993) ("[T]o construe the claims

in the manner suggested by TI would read an express limitation out of the claims. This, we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth' " (quoting *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 396, 155 USPQ 697, 701 (Ct.Cl.1967)).). Here, we hold that the district court correctly construed "permanently" according to its ordinary and accustomed meaning—that is, the phrase "permanently affixed" requires that the connection between the bootie and the base of the skate be unremovable.

■ K–2 argues that *its* proposed definition of "permanently affixed"—meaning "affixed to prevent sliding in a horizontal plane"—is the ordinary and accustomed meaning of the phrase, and that in any event, Salomon has not presented evidence to support its contention that the ordinary and accustomed meaning of the phrase is "unremovable." We, of course, recognize that the "ordinary and accustomed" meaning of a claim term will often be in dispute, irrespective of the clarity of the terms used. *See Senmed, Inc. v. Richard–Allan Med. Indus., Inc.*, 888 F.2d 815, 819 n. 8, 12 USPQ2d 1508, 1512 n. 8 (Fed.Cir.1989) ("Lawyers may create a 'dispute' about any word, but there is nothing ambiguous or linguistically obscure about [the disputed claim term] as used in the present claim."). But a dispute over the ordinary and accustomed meaning does not imply that such a meaning does not exist. Here, for example, we recognize that the term "permanently" has what can be said to be the flavor of infiniteness about its meaning, which might raise questions about the use of the term in this claim: even the most permanent of "permanently affixed" connections between the bootie and the base of the skate can, after all, be undone upon the total destruction of the skate itself. This, however, does not mean that because no connection between the bootie and skate can be "infinitely" permanent, there can be no ordinary and accustomed meaning for the claim term. Indeed, we would be hard pressed to describe *any-thing* as "permanent" if that term is understood to require an infinite duration. But claim construction is not philosophy; we need not wring our hands when considering the implications of a metaphysical analysis of claim terms. Instead, we need only recognize that claim construction is firmly anchored in reality by the understanding of those of ordinary skill in the art. *See, e.g., Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1578, 38 USPQ2d 1126, 1129 (Fed.Cir.1996). In this case, the parties and the district court agree that the rivet and screw attachment in the toe area of the accused skate meet the "permanently affixed" claim limitations. This is so because the rivet supplies the permanent, unremovable connection. Indeed, in the written description of the '466 patent, a rivet is cited as a conventional fastening means to accomplish a permanent connection. *See* '466 Pat., col. 8, ll. 55–58 (describing connection between base and lower frame). The rivet-made permanent connection is of course not "infinitely" permanent, because the rivet can be broken. The same is true of an embodiment of the invention that achieved a permanent connection between the base portion and the lower frame portion of the skate by using a single injection molded unit. *See id.* at col. 8, ll. 58–61. Likewise, were an adhesive laminate used to provide the permanent connection, *see id.* at col. 13, ll. 48–55, that permanence too could be destroyed by breaking the structure apart. Screws, unlike rivets and laminates, are meant to be unscrewed, that is, to be removed. A rivet or a laminate, to the contrary, is meant to remain permanent, unremovable unless one is bent on breaking the permanent structure apart.

Here, we are convinced that the district court was correct in holding that the ordinary and accustomed meaning of "permanently affixed" requires an unremovable connection between the bootie and the base.

■ Because we agree with the district court's construction of permanently af-

fixed, and the parties do not dispute that Salomons accused device utilizes a removable screw to connect the heel of the bootie to the skate's base,[1] we conclude that the district court was correct in granting summary judgment of no literal infringement in favor of Salomon. [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motions, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III

Although Salomon's accused device cannot—as a matter of law—literally infringe, we must still determine whether the doctrine of equivalents may nonetheless allow K–2 to raise genuine issues of material fact regarding infringement under the doctrine of equivalents. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The doctrine of equivalents allows infringement to be found in some cases where the elements of the accused device are substantially equivalent to the corresponding elements of the asserted claim. *See Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1869 (1997). Infringement under the doctrine of equivalents is a question of fact. *See Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 609–10, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328, 331 (1950).

### A

Although the Supreme Court in *Warner–Jenkinson* reaffirmed the existence of the doctrine of equivalents, it did so with "concern ... that the doctrine of equivalents ... has taken on a life of its own, unbounded by the patent claims." 520 U.S. at 28–29, 117 S.Ct. 1040, 41 USPQ2d at 1871. Indeed, while unquestionably retaining vitality, the doctrine of equivalents exists in some tension with other core tenets of the patent law, perhaps most notably the requirement that the patentee "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention," 35 U.S.C. § 112 ¶ 2 (1994), and the function of patent claims to provide notice to competitors regarding the scope of the patent grant, *see United Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 232, 63 S.Ct. 165, 87 L.Ed. 232, 55 USPQ 381, 383–84 (1942) ("The inventor must inform the public ... of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not" (internal quotes omitted).). *See also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141 150–51, 109 S.Ct. 971, 103 L.Ed.2d 118, 9 USPQ2d 1847, 1852 (1989) (describing how the "carefully crafted bargain" of the patent system "depend[s] almost entirely upon a backdrop of free competition in the exploitation of unpatented designs and innovations.").

The courts have responded to such concerns by developing an array of legal limitations, formulations, and tests regarding the application of the doctrine of equivalents. These efforts reflect two animating concepts. The first is that the

---

1. We are puzzled by the dissent's insistence that additional fact-finding is required with respect to the "removable" nature of the heel screw. K–2 does not dispute—indeed, it fully acknowledges—that the heel screw is removable, and that removing the heel screw allows the heel portion of the bootie to lift ("slightly") upwards away from the base. *See* Reply Br. at 13, 20. Further, K–2's expert, in an affidavit filed with the district court, notes that the heel screw (which holds the heel portion of the bootie in place) may be unscrewed. *See* Grande Aff. ¶ 5. Salomon's expert concurs with this description of the accused skate. *See* Sènèe Aff. ¶¶ 11, 12, 14. We will not create a genuine issue of material fact where the parties agree that none exists.

doctrine of equivalents is *limited*. It cannot allow a patent claim to encompass subject matter that could not have been patented; nor can it be used to ignore the actual language of the patent. Thus, we have held that the doctrine of equivalents cannot allow a patent to encompass subject matter existing in the prior art. *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684, 14 USPQ2d 1942, 1948 (Fed.Cir.1990) ("[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims."); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1577, 29 USPQ2d 1373, 1378 (Fed.Cir.1994) ([T]he fundamental purpose of all [doctrine of equivalents] evaluations must be to prevent the patentee from "obtain[ing], under the doctrine of equivalents, coverage which [the patentee] could not lawfully have obtained from the [Patent and Trademark Office] by literal claims" (quoting *Wilson Sporting Goods* ).). Nor may it allow coverage of obvious, or "trivial," variations of the prior art, *see, e.g., Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1580, 34 USPQ2d 1673, 1680 (Fed.Cir.1995), for such subject matter could not have been lawfully patented in the first instance. *See* 35 U.S.C. § 103(a) (Supp.1998) ("A patent may not be obtained ... if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art."). It is also fundamental that the text of the claim must be closely followed: "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040, 41 USPQ2d at 1871. *See also Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935, 4 USPQ2d 1737, 1739–40 (Fed. Cir.1987) (en banc). Therefore, the doctrine of equivalents cannot be used to viti-

ate an element from the claim in its entirety. *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040, 41 USPQ2d at 1871; *see also Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160, 47 USPQ2d 1829, 1834 (Fed.Cir. 1998) ("If a theory of equivalence would vitiate a claim limitation, however, then there can be no infringement under the doctrine of equivalents as a matter of law."). Similarly, where the patent document expressly identifies a role for a claim limitation, the doctrine of equivalents cannot be used to capture subject matter that does not substantially fulfill that role. *See Warner–Jenkinson*, 520 U.S. at 40, 117 S.Ct. 1040, 41 USPQ2d at 1875 ("An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claim[ ] element."); *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1574, 40 USPQ2d 1481, 1489 (Fed.Cir.1996) (holding that disputed claim limitation, read in light of the written description, requires a function not performed by the accused device). These limitations on the doctrine of equivalents are questions of law. *See Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040, 41 USPQ2d at 1875 n. 8 ("Of course, the various legal limitations on the application of the doctrine of equivalents are to be determined by the court.").

The second conceptual limitation on the doctrine of equivalents is the idea that the patentee may not use the doctrine to recover subject matter that has been surrendered. For example, prosecution history estoppel will exclude from the doctrine of equivalents any subject matter that was, by amendment or argument during prosecution, relinquished. *See Warner–Jenkinson*, 520 U.S. at 30–31, 117 S.Ct. 1040, 41 USPQ2d at 1871; *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1455, 46 USPQ2d 1321, 1325 (Fed.

Cir.1998) (prosecution history estoppel "bars recapture of that subject matter actually surrendered during prosecution"). Prosecution history estoppel may in certain cases be presumed, *see Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040, 41 USPQ2d at 1873, and the scope of such estoppel can be, depending on the circumstances, anywhere "from great to small to zero." *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1363, 219 USPQ 473, 481 (Fed.Cir.1983). *See also Litton Sys.,* 140 F.3d at 1462, 46 USPQ2d at 1331 ("[T]he scope of estoppel is a product of the effects of both [amendments and arguments] working in concert."); *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 832, 49 USPQ2d 1865, 1875 (Fed. Cir.1999) ("[P]rosecution history estoppel arising from the operation of the *Warner–Jenkinson* presumption allows the doctrine of equivalents no room to operate."). In a similar vein, we have also stated that particular subject matter disclosed in the patent specification but not claimed is deemed to have been surrendered. *See Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1106–07, 39 USPQ2d 1001, 1006 (Fed.Cir.1996). Again, these are questions of law. *See Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040, 41 USPQ2d at 1875 n. 8.

Taken together, these concepts—that the doctrine of equivalents is both limited and subject to estoppel—reflects this court's (and the Supreme Court's) approach of maintaining the principled application of the doctrine of equivalents while hewing closely to the doctrine's original purpose: to prevent fraud on a patent. *See Graver Tank,* 339 U.S. at 608, 70 S.Ct. 854, 85 USPQ at 330 ("The essence of the doctrine is that one may not practice fraud on a patent."). Where these limitations are inapplicable, the doctrine of equivalents operates to "prevent an infringer from stealing the benefit of an invention." *Id.* (quoting *Royal Typewriter Co. v. Remington Rand,* 168 F.2d 691, 692, 77 USPQ 517, 518 (2d Cir.1948) (Hand, J.).). To have this effect, however, the doctrine of equivalents must, as noted above, remain within the boundaries established by the prior art, the scope of the patent claims themselves, and any surrendered subject matter.

## B

■ In this case, K–2 asserts that the removable screw attaching the heel of the bootie in Salomon's skate is substantially equivalent to the "permanently affixed" fastening required by the claims of the '466 patent. Salomon responds by arguing that K–2, during prosecution and reexamination, surrendered any subject matter encompassing a removable connection between the bootie and the base of the skate. We agree with Salomon that the doctrine of equivalents, as a matter of law, cannot encompass the accused skate's removable screw.

The Johnson reference describes and depicts an in-line skate with an easily removable upper shoe portion that can be attached to the base of the skate. A second prior art reference, French Patent No. 2,688,072 (the "French reference"), teaches a soft upper bootie attached to the skate base with screws at the toe and the heel. Given these two pieces of prior art, and the undisputed fact that the accused skate utilizes a removable screw to attach the heel of the soft upper bootie to the base of the skate, we have no trouble concluding that the doctrine of equivalents cannot allow the '466 patent's "permanently affixed" limitation to expand to cover the accused device's removable screw.

First, because the Salomon skate's removable heel screw is, at most, an obvious variation of the French reference's screw attachment and the Johnson reference's removable upper shoe (either alone or taken in combination), the doctrine of equivalents cannot, as a matter of law, expand the '466 patent to encompass the Salomon skate. To hold otherwise would allow the '466 patent, through the doctrine of equivalents, to cover subject matter that could not have been legally patented in the first instance. *Cf. Wilson Sporting Goods,* 904 F.2d at 684, 14 USPQ2d at 1948; *Con-*

*roy,* 14 F.3d at 1576–77, 29 USPQ2d at 1378; *Southwall Technologies,* 54 F.3d at 1580, 34 USPQ2d at 1680.

Second, the patentee, during prosecution, made amendments and statements that would lead a reasonable competitor to objectively conclude that the subject matter of removable screw attachments was relinquished. *See, e.g., Sextant Avionique,* 172 F.3d at 826–27, 49 USPQ2d at 1871 ("The scope of the estoppel, *i.e.,* what subject matter has been surrendered during prosecution by the patentee, is to be determined from the vantage point of a reasonable competitor of the patentee."). First, the "permanently affixed" limitation of the '466 claims was added in response to the examiner's rejection of the claims in light of the Johnson reference. In doing so, the applicant stated explicitly that the "permanently affixed" limitation distinguished the amended claims from the "detachable" shoe of the Johnson reference. During reexamination, when the patentee cited the French reference to the examiner, the phrase "at least at said toe are and heel area" was among the text added to the claims. Given the relationship between the prior art references, the amendments made, and the statements by the applicant, one of ordinary skill in the art would clearly conclude that removable screw attachments between the bootie and a base were relinquished.

The district court was correct in concluding that the Salomon skate could not infringe the '466 patent under the doctrine of equivalents.

### C

■ Salomon urges us to conclude that there is no discernible explanation in the prosecution history for the "heel-and-toe" amendments discussed above. In this circumstance, says Salomon, the presumption in favor of prosecution history estoppel established by the Supreme Court in *Warner–Jenkinson* applies. *See* 520 U.S. at 33, 117 S.Ct. 1040, 41 USPQ2d at 1873. Thus, Salomon argues, our recent decision in *Sextant Avionique* compels the holding that the doctrine of equivalents cannot be applied to the amended claim limitations. *See Sextant Avionique,* 172 F.3d at 832, 49 USPQ2d at 1875 ("[P]rosecution history estoppel arising from the operation of the Warner–Jenkinson presumption allows the doctrine of equivalents no room to operate."). We disagree.

■ Whether or not an amendment was made for reasons of patentability is a legal question. *See Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1460, 46 USPQ2d 1169, 1178 (Fed.Cir.1998) (en banc) (application of prosecution history estoppel is a question of law); *Litton Sys.,* 140 F.3d at 1462, 46 USPQ2d at 1330 (scope of prosecution history estoppel is a question of law); *Sextant Avionique,* 172 F.3d at 826, 49 USPQ2d at 1870–71. In this case, our review of the prosecution history makes it plain that the amendments relevant here were made for a "substantial reason related to patentability." *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040, 41 USPQ2d at 1875.

The "heel-and-toe" amendments, which were entered by the examiner during reexamination after a telephone conference with the patentee, were made for such a reason. See *id.,* 520 U.S. at 33, 117 S.Ct. 1040, 41 USPQ2d at 1875. These amendments were entered after the citation of additional prior art to the examiner (including the highly relevant French reference discussed above), and unquestionably in light of the earlier art cited against the claims, such as the Johnson reference. These facts make it clear that the patent would probably not have been (re)issued without the amendments, which makes them, of course, "related to patentability." *Id.* at 33, 117 S.Ct. 1040, 41 USPQ2d at 1875. *See Litton Sys.,* 140 F.3d at 1461, 46 USPQ2d at 1330 (amendments made without formal prior art rejection can be "related to patentability"). The fact that the words were formally entered by the examiner (after conversation with the applicant) rather than the applicant does not affect the question of whether a substantial reason related to patentability

precipitated their addition. Indeed, Salomon itself states that "it is clear that the examiner would not have allowed the claims over Johnson and the other prior art without the [heel-and-toe] limitations." Thus, we conclude that the *Warner–Jenkinson* presumption, and the consequent bar against the doctrine of equivalents under *Sextant Avionique,* is inapplicable to this case. *See, e.g., Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1355, 48 USPQ2d 1674, 1677 (Fed.Cir.1998) (holding that where the reason for an amendment is clear from the prosecution history, the *Warner–Jenkinson* presumption does not apply).

## CONCLUSION

Claim terms, in general, mean what they say. The district court correctly interpreted the claim limitation "permanently affixed" to require an unremovable connection between the bootie and the base of the skate. We therefore affirm the district court's holding that the Salomon skate cannot, as a matter of law, literally infringe the '466 patent. We also affirm the district court's holding that the doctrine of equivalents cannot, as a matter of law, be used to expand the '466 claims to cover the Salomon skate. The summary judgment in favor of Salomon is affirmed.

## COSTS

No costs.

*AFFIRMED*

RADER, Circuit Judge, dissenting.

The court today determines that the "ordinary and accustomed meaning" of the claim term "permanently affixed" summarily precludes both literal infringement and infringement under the doctrine of equivalents. My reading of patent law and the patent in this case suggest a different result.

With regard to claim interpretation, this court reaches a hasty, unsupported judgment on the meaning of the term "permanently." This court opines that it "need only recognize that claim construction is

firmly anchored in reality by the understanding of those of ordinary skill in the art." Yet, this court does not even consider the meaning an ordinary in-line skate artisan would attach to "permanently." Instead, this court summarily concludes that the term "permanent" should mean what it thinks it should mean.

Divorced from context, words lose their ordinary and accustomed meanings. *See, e.g., Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 397, 155 USPQ 697, 702 (Ct.Cl.1967) ("Claims cannot be clear and unambiguous on their face."). "Permanent" in the context of mountain ranges can mean millennia; "permanent" in the context of hair treatments can mean until the next rain storm; "permanent" in the context of creased pants can mean until the next long airline trip in coach class; "permanent" in the context of genetic combinations can mean until the next mutation. When judges intuit an ordinary and accustomed meaning divorced from context, they are (usually unwittingly) imposing their own subjective linguistic values on a public decision.

As this court verbally recognizes but substantively ignores, the understanding of one of ordinary skill in the art sets the proper context for the meaning of claim terms. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 986, 34 USPQ2d 1321, 1335 (Fed.Cir.1995) (en banc) ("[T]he focus in construing disputed terms in claim language is . . . on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."). The art in this case is in-line skates. The reexamined '466 patent claims an in-line skate with improved responsiveness to the foot movements of a skater. The patent achieves this result by permanently affixing a flexible shoe upper to the base. The terms "permanent" and "non-removable," therefore, in proper context, refer to a relationship between the shoe and the base.

This court's opinion gives absolutely no context or support for its "ordinary and accustomed meaning" of "permanently affixed." Instead, it begins with its conclusion—"[t]he ordinary and accustomed meaning of this phrase ... does not encompass affixation via removable screw" – and does not consider any evidence from those of ordinary skill in the art. This court's extremely narrow interpretation of this phrase could potentially deny the patentee almost any coverage, because, in the theoretical, out-of-context reading of this court, almost nothing is permanent. After all, those of skill in this art may recognize that even lamination (the method of affixation described in the patent) is removable with a chemical solvent. In fact, an adhesive affixation may, to those of skill in this art, in fact be less permanent (becoming loose over time) than screws for connecting shoes to skates. This summary proceeding record does not supply the context necessary for an accurate decision. Nonetheless, this court dismisses the question on the basis of a supposed ordinary and accustomed meaning.

Although the court construed the claim language out of context, its biggest stretch is its fact-finding on appeal about the nature of the accused skate. This court hastily finds that the accused skate affixes the shoe to the base with a "removable screw." On this purely factual issue (nonetheless resolved summarily and on appeal), the record contains no evidence that the accused skate's screw was ever removed or would ever be removed for any purpose. Hence, a conclusion about whether the screw was or was not "meant to be unscrewed" is premature. Indeed, the record shows that the flexible shoe of the accused skate was permanently attached to the base at the toe area by use of rivets and an (unremovable?) screw. Therefore, even if a user disassembled the accused shoe to gain access to the allegedly "removable" heel screw, that user could not remove the shoe from the base because the four rivets and the apparently unremovable screw in the toe would ensure the "shoe portion" remained "permanently af-

fixed" to "said base portion." This court nevertheless finds that the heel screw is "removable" without any evidence that it was ever removed or "meant to be" removed at all – a particularly egregious stretch on appeal from summary judgment.

This court protests (too much?) that it will "not create a genuine issue of material fact where the parties agree that none exists." In doing so, however, it betrays the dangers of fact-finding on appeal. Specifically, this court states that K–2 "fully acknowledges ... that the heel screw is 'removable.'" Certainly, K–2 did not concede away its entire case. Indeed, an examination of the full context of K–2's statement shows that this court has taken sides in a factual dispute. K–2 in their reply brief explains:

> Though the screw at the heel of the [accused] skate can be removed with effort, it is not substantially different from a permanent or non-removable connection. As with gluing or laminating, the base and shoe are held tightly together and "become one." Indeed, unlike the Johnson soft shoe, the heel portion of the non-rigid [accused] skate shoe *cannot be removed* from the base. Rather, at most it can be pried up slightly so that a piece of paper can be wedged underneath.

(Emphasis added.) Again, at the other place cited to show that K–2 "fully acknowledges" that the screw is removable, K–2 in fact explains in its reply brief:

> Though the screws can be removed with effort, the rivets prevent the shoe (which includes the integrally-connected toe and heel portions) from being removed without destroying it.

Thus, this court has imposed its definition of "removable" and its factual view of the accused skate on K–2, thus resolving on appeal – without testimony and without a full record – the factual issues which are the heart of this dispute in the first place. The point is that the record shows no instance of removal of the heel screw and

**1372**

no purpose for ever removing the heel screw because the connection of shoe to skate remains "permanent" in any event. Is a screw that has never been removed and will never be removed "removable?" Does it make a difference if it is removable (in the surreal sense adopted by this court) because the shoe remains "permanently affixed" to the skate "for substantially preventing movement therebetween?" This court decides these factual issues on appeal and on summary judgment.

This court's hasty judgment about the nature of the accused skate includes reasoning about prosecution history. In this case, however, the Johnson prior art and the prosecution history indisputably discuss only skates which accommodated complete removal and replacement of the shoe. Thus the prior art emphasized disassembly and removal, not permanent fixation. The rivets in the toe and the unremovable "removable screw" already removes this accused device from any similarity with the prior art from which the patentee distinguished itself.

In sum, this court could only have resolved infringement in this case (particularly infringement by equivalents) by undertaking extensive fact finding on summary judgment and on appeal. Sadly, finding on appeal that the screw is "removable" and summarily importing a meaning for "permanent" removes this judgment from any permanent connection with the in-line skate art.