**NELLCOR PURITAN BENNETT, INC. and Mallinckrodt, Inc., Plaintiff,**

v.

**MASIMO CORPORATION Defendant.**

**No. CV 03–0603 MRP.**

United States District Court, C.D. California.

Jan. 21, 2004.

Craig N. Hentschel, Arnold & Porter, Los Angeles, CA, Robert C. Morgan, Fish & Neave, New York City, Kevin P. B. Johnson, Fish & Neave, Palo Alto, CA, for Mallinckrodt Inc, Nellcor Puritan Bennett, Inc, plaintiff.

James F. Lesniak, Joe Re, Jon W. Gurka, Joseph S. Cianfrani, Irfan A. Lateef, Knobbe Martens Olson & Bear, Irvine, CA, for Masimo Corporation, defendant.

**MEMORANDUM OF DECISION RE:** Masimo's Motion for Summary Judgment of Noninfringement of U.S. Patent 4,934,372

PFAELZER, District Judge.

## BACKGROUND

Plaintiffs Nellcor Puritan Bennett, Inc. and Mallinckrodt, Inc. (collectively "Nellcor") and Defendant Masimo Corporation ("Masimo") are engaged in manufacturing and selling equipment used in pulse oximetry. Pulse oximetry involves measuring a patient's heart and lung function via a noninvasive procedure that calculates pulse and arterial blood oxygen saturation. A pulse-oximeter includes a photo-emitter that sends light through a patient's tissue, a photodetector that measures the light transmitted through the tissue, and a monitor that computes the patient's blood oxygen saturation from the measured data.

Nellcor alleges that Masimo infringes U.S. Patent No. 4,934,372 (the " '372 patent").[1] Nellcor attempted to assert this patent in another case before this Court, *Mallinckrodt, Inc. et al. v. Masimo Corp.* (CV-00-6506) ("the Consolidated Cases"). On July 15, 2002, this Court denied Nellcor leave to add the alleged infringement of the '372 patent to its Complaint in the Consolidated Cases. In this action, Nellcor asserts the infringement claims relating to the '372 patent that they were not permitted to bring into the Consolidated Cases.

On December 1, 2003 Masimo filed a Motion for Summary Judgment supported by a memorandum ("Masimo Mot.") and declarations ("Lateef Decl." and "Diab Decl." (filed under seal)). Nellcor filed its Opposition ("Nellcor Opp." (filed under seal)) and declaration ("Corenman Decl." (filed under seal)) on December 18, 2003. On January 5, 2003, Masimo filed a Reply and declaration ("Oldham Decl."). The Court heard this Motion on January 12, 2003, and took the matter under submission. For the reasons outlined below, this Court GRANTS Masimo's Motion for Summary Judgment for non-infringement.

## TECHNOLOGY

### I. Patent Claims at Issue

Both the claims of Masimo and of Nellcor relate to the pulse oximeter. Nellcor asserts that Masimo's products, including, without limitation, Masimo's RadicalTM and Rad–9TM pulse oximeters and MS circuit boards, infringe Claims 1, 2, 20 and 21 of Nellcor's '372 patent. Claims 1 and 20 are independent claims.

#### A. *Claim 1*

Claim 1 claims "a method for calculating the amount of a blood constituent from the blood flow characteristics of a patient." '372 patent col. 59: 19–21. Claim 1

---

1. Nellcor initially alleged infringement of its 5,267,563 (" '563 patent") and 5,392,777 (" '777") patents as well, but has since stated that it "unconditionally withdraws and agrees not to pursue now or in the future its allegation that Masimo infringes the '563 and '777 patents based on Masimo's past and current activities, including Nellcor's allegations of direct infringement (literal and under the doctrine of equivalents) and inducing infringement." Joint Report of the Parties Pursuant to Federal Rule of Civil Procedure 26(f) and Local Rule 26–1 (filed April 7, 2003) ("Rule 26(f) Report").

includes the element of "processing the time-measure collectively to determine a composite waveform ... so that the aperiodic information is *attenuated and filtered* from the composite." *Id.* at 34–40 (emphasis added). Claim 1 also includes a method for determining oxygen saturation that "*calculat[es] the amount of blood constituent from the relative maximum and minimum amplitude of the composite periodic* waveforms of the detected wavelengths." *Id.* at 41–44 (emphasis added).

### B. *Claim 20*

Claim 20 includes similar limitations, but is structured in a means-plus-function format, where the functions are the steps of Claim 1.

### II. Removal of Aperiodic Noise

Claims 1 and 20 of '372 require a specific software routine for filtering out noise from the signals and then calculating oxygen saturation. Nellcor claims that the software routine used in Masimo's oximeters, the chirp-z routine, causes Masimo's oximeters to infringe. The chirp-z routine transforms patient signals from the time domain into the frequency domain.[2] Nellcor contends that Masimo's chirp-z routine infringes the '372 patent because it involves the same processes as used in the '372 patent to reduce the aperiodic information from the signals.

Specifically, Nellcor alleges that the transformation from time to frequency domain in Masimo's patent involves the "sum[mation] of amplitudes of the periodic signal at the periodic frequency, while spreading the amplitude of the aperiodic information across the frequency spectrum." Nellcor Opp. at 7. Nellcor alleges that the "aperiodic information is reduced in comparison to the desired, periodic in-

formation." *Id.* This process is identical to that Nellcor claims as its own.

Masimo disagrees with Nellcor, and asserts that Masimo's products do not infringe because Nellcor's '372 patent requires that the aperiodic information be "reduced and removed" prior to calculation, whereas Masimo's patent does not. Masimo further alleges that it does not use the minimum amplitude or zero-frequency measure in the calculation of oxygen saturation, while the Nellcor patent requires the use of both the maximum and the minimum amplitudes in the calculation.

### STANDARD OF REVIEW

Summary judgment is appropriate when the submissions show that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party, Masimo for this Motion, "bears the burden of demonstrating the absence of genuine issues of material fact." *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994). In reviewing Masimo's motion for summary judgment of non-infringement, the Court must draw all reasonable inferences in favor of Nellcor. *Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261, 1270 (Fed.Cir.1999).

### ANALYSIS

■ In any infringement analysis, the court must first determine the legal scope and meaning of the disputed claim terms. The court must then compare the accused device to the properly construed claims, to see whether the accused device contains all the limitations, either literally or by equivalents, that are in the claimed invention.

2. Nellcor refers to this transformation from the time to frequency domain as a "Fourier

transformation." Nellcor Opp. at 7.

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996).

■ The absence of a single claim limitation or its equivalent in the accused combination precludes infringement. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991). If a court does not find infringement of the independent claims, then a court may not find infringement of the dependant claims, either. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed.Cir.1989).

## I. Claim Construction

### A. *Legal Scope and Meaning*

■ Claim construction is a question of law for the court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (*en banc*). When interpreting claims of the patent, the Court should begin by considering the words of the claim. *See K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed.Cir.1999); *Vitronics Corp.*, 90 F.3d at 1582. The Federal Circuit has explained that in construing claims "the analytical focus must begin and remain centered on the language of the claims themselves, for that is the language that the patentee chose to use to particularly point out and distinctly claim" as the subject matter for his/her invention. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir.2002), *cert. denied*, — U.S.—, 123 S.Ct. 2230, 155 L.Ed.2d 1108 (2003) (quoting 35 U.S.C. § 112).

■ The Federal Circuit imposes a "heavy presumption that the claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002) (internal quotations omitted). Dictionaries, encyclopedias, and treatises are "par-ticularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital Sys., Inc.*, 308 F.3d at 1202. If the dictionary provides more than one meaning, then the Court should look to the intrinsic record (that is, the claims, specification, and prosecution history) to determine which definition is applicable and appropriate given the context. *See Texas Digital Sys., Inc.*, 308 F.3d at 1203; *CCS Fitness, Inc.*, 288 F.3d at 1366 (explaining permissible use of intrinsic evidence); *see also Ferguson Beauregard/Logic Controls div. of Dover Res., Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1338 (Fed.Cir.2003) ("Dictionary definitions, while reflective of the ordinary meanings of words, do not always associate those meanings with context or reflect the customary usage of words by those skilled in a particular art.").

■ The Federal Circuit has delineated four instances where the a claim term will not be given its ordinary meaning: (1) if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in the specification or prosecution; (2) if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention; (3) if the term chosen by the patentee "so deprives the claim of clarity" as to require resort to the other intrinsic evidence for a definite meaning; and (4) if the claim is a means-plus-function format. *CCS Fitness, Inc.*, 288 F.3d at 1366–67.

### B. *Claim Term Construction: Nellcor's '372 Patent Claim Terms*

#### 1. "ATTENUATED AND FILTERED FROM"

■ The phrase "ATTENUATED AND FILTERED FROM" (Claim 1) is con-

strued by the Court to mean reduced and removed. This Court declines to adopt Nellcor's interpretation of the limitation, which is "reduced in comparison to the desired information." Accepting Nellcor's interpretation would oblige this Court to construe the claim in a way such that "no removal or reduction" of any aperiodic information (that is, noise) is required. *See* Nellcor Opp. at 2. Nellcor asserts, instead, that aperiodic information is "spread across the time frame of the composite waveform," thus "reduc[ing] in comparison" its magnitude to that of the "desired, periodic information." *Id.* at 3. This Court finds that such an interpretation is contradictory to both the terms of the patent and the file history.

### a. Ordinary and Customary Meaning

Webster's dictionary defines "attenuate" as "to lessen the amount, force or value of" (Webster's Third New Int'l Dictionary ("Webster's"), Lateef Decl., Ex. 9 at 3); the IEEE Dictionary defines "attenuate" as "a *decrease in* signal *magnitude* between two points or between two frequencies." The Authoritative Dictionary of IEEE Standards Terms ("IEEE Dictionary"), Lateef Decl., Ex. 10 at 3 (emphasis added).

Similarly, Webster's dictionary defines "filter" as "a device or material for suppressing or minimizing waves or oscillations of certain frequencies passing through it without greatly altering the intensity of others." Webster's at 3. The IEEE Dictionary defines filter as (1) "a transducer for separating waves on the basis of their frequency ...;" and (2) "a device or program that separates data, signals, or materials in accordance with specified criteria." IEEE, Ex. 10, at 5. The IEEE Dictionary also provides a definition requiring that a filter "eliminate a portion of the signal." *Id.*

In deciding which dictionary definition to apply, the Federal Circuit instructs this Court to look at the intrinsic evidence and decide which definition best fits within the context of the patent.

Nellcor claims that its purported interpretation of "attenuated and filtered from" as "reduced in comparison" is "consistent with the ordinary meaning of those terms to one of ordinary skill in the art." Nellcor Opp. at 12. To prove this, Nellcor relies upon the IEEE definition for the meaning of "attenuate." *See* IEEE Dictionary, Ex. 10 at 3 ("a *decrease in* signal *magnitude* between two points or between two frequencies"). Nellcor asserts that attenuation is used in the '372 patent to explain the process whereby the "aperiodic information is *decreased in magnitude in relation to* the periodic information." Nellcor Opp. at 12.

Masimo contends that by inserting the words "in relation to" into their application of the definition to the '372 patent, Nellcor has altered the IEEE Dictionary definition to support its own "reduced in comparison" language. Masimo asserts that such a manipulation is neither supported by case law nor by the patent itself. Instead Masimo claims this Court should rely more heavily upon Webster's definition of attenuate, which is "to lessen the amount force or value of." Masimo Mot. at 11.

This Court finds that both the IEEE Dictionary and the Webster's definitions are relevant in construing the term "attenuate" given the context of the '372 patent. Regardless of the source this Court chooses to apply, the result is the same, as both definitions indicate that "attenuate" implies reduction—and perhaps even "reduction in comparison." Nonetheless, this Court does not adopt Nellcor's construction of reduced in comparison, because doing so would render this claim construction

analysis incomplete, as only one of the two terms would be construed.

In construing the word "filter" Nellcor relies upon the Webster's definition of "filter" as "a device or material for suppressing or minimizing waves or oscillations of certain frequencies passing through it without greatly altering the intensity of others." Webster's at 3. Nellcor explains that this definition is consistent with the use of the term "filtered" in the '372 patent because "aperiodic information [is] being spread across the frequency spectrum, such that its magnitude is decreased or minimized, *in relation to* the periodic information." [3]

Again, Masimo objects to Nellcor's insertion of the words "in relation" into the interpretation. Masimo, instead asserts that "filter" means "removed." In coming to this conclusion, Masimo relies heavily upon Webster's definition of the verb "to filter." Masimo Mot. at 11. Webster's defines "to filter" as "to remove ... by means of a filter." Webster's, Lateef Decl., Ex. 9, at 5.

This Court was not immediately convinced that "filter" means "remove." First, as Nellcor points out, the definition upon which Masimo relies reads in full: "to remove *from a fluid* by means of a filter." Webster's, Lateef Decl., Ex. 9, at 5 (emphasis added). Thus, as Nellcor asserts, this definition may not be completely relevant to the technology at issue in this case. Second, none of the definitions mentioned above clearly indicates that filter means "remove."

Nonetheless, in considering the complete picture—including the claim language, the specification, and the file history—this Court ultimately agrees with Masimo and concludes that filter in this context means remove, and that the phrase "attenuate and filter" means reduce and remove.

### b. Claim Language

The language at issue claims a process whereby "aperiodic information present in the time-measure is *attenuated and filtered* from the composite." '372 patent, col. 1:38–40. The law assumes that Nellcor chose those particular words in the claim for a particular purpose. The fact that Nellcor chose to use *both* attenuate *and* filter—side-by-side, in the same phrase—to describe this process indicates that these words carry *unique* meanings. If this Court were to adopt Nellcor's construction, then the words "attenuate" and "filter" would lose their individuality and purpose, since either word, taken on its own, could be construed to mean "reduce in comparison."

Similarly, Nellcor's interpretation is incomplete. The words "attenuate" and "filter" and the phrase "attenuated and filtered from" need to be considered within the context of the language of the claim. Claim 1 of the '372 patent claims (in pertinent part): "processing the time-measure collectively to determine a composite ... so that the aperiodic information present in the time-measure is attenuated and filtered from the composite; and *thereafter* calculating ...." '372, col 59:34–40.

In breaking down the language of the claim, Nellcor appears to be claiming a two-step process: (1) the formation of the composite and (2) the calculating step. Nellcor itself does not contest the fact that aperiodic information is removed *prior* to the calculating step. *See* Nellcor Opp. at 2 ("Desired periodic portions of the composite signal are selected for further processing and use[d] in calculating oxygen

---

**3.** Further, Nellcor rejected Masimo's use of the IEEE Dictionary definition of filter—as meaning "eliminate a portion of a signal"—explaining that since no reduction or removal of aperiodic information occurs, that definition is irrelevant. *See* Nellcor Opp. at 14.

saturation, thereby *removing* the aperiodic information from the composite signal.") (emphasis added).

Thus, as Nellcor explains, the aperiodic information must be removed at some point between the formation of the composite and the calculating step. The claim language itself only leaves one point at which that removal could occur: filtration. Therefore, the claim language read in context clearly supports a construction of "attenuated and filtered" that means reduced and removed.

Further, by adopting Masimo's interpretation of "reduce and remove" both attenuate and filter retain meaning and purpose. The two words work in conjunction to describe a complete process whereby aperiodic information is attenuated (reduced) and filtered (removed).

Finally, the placement of the word "from"—in the phrase "attenuated and filtered *from* "—is quite telling as well. Nellcor's word choice implies that something is taken or removed *from*, rather than merely reduced in comparison. This notion is further explained and clarified when viewed in the context of the language in the specification as well as the file history.

### c. Specification

For additional support of the "reduced and removed" construction, Masimo cites several parts of the '372 patent specification where the terms "attenuated" and "filtered" mean reduced and removed. For example, column 7 of the patent states that the process creates a composite waveform "from which noise, spurious signals, and motion artifact, have been *filtered out.*" '372 at 7:33–38. "Filtered out" in this context clearly supports a construction that implies removal.

### d. File History:

The file history of '372 patent provides the strongest support for the conclusion that "attenuated and filtered" means reduced and removed. The record of the prosecution clearly indicates that one of the characteristics distinguishing the '372 patent from the prior art (the New, Jr. Patent) is that the '372 patent requires the *removal* of aperiodic information *prior to* the calculation of oxygen saturation in the blood, while the prior art did not. *See* Examiner's Report, Lateef Decl., Ex. 1 at 208–211.

Specifically, Nellcor argued to the PTO: "In contrast to the New [,Jr.] patent, [Nellcor's] application teaches that by collecting and collectively processing time-measures to obtain a composite waveform *from which aperiodic information is removed* ... one does not need to examine pulse against confidence criteria or to determine whether that pulse is a periodic or aperiodic pulse before the blood constituent can reliably and accurately be determined." Id. at 210–11 (emphasis added).

The prior art required the examination of each pulse against confidence criteria; Nellcor urges that the importance of its argument to the PTO was not to emphasize the removal of aperiodic information, but rather to claim the improvement of a "composite waveform." Nellcor adamantly contends that the prosecution history should not be read to limit the '372 patent to require "removal," instead Nellcor explains that the term "removal" should be read as a proxy for "reduced in comparison."

 This Court should not be convinced by Nellcor's alternate interpretation. Nellcor cannot argue one meaning to the PTO to distinguish itself from the prior art, and then argue a different meaning to this Court to prove infringement. Thus, this Court should find that in light of the

surrounding evidence, the most appropriate interpretation of "attenuated and filtered" is "reduced and removed."

## 2. "CALCULATING ... FROM THE RELATIVE MAXIMUM ... AND MINIMUM"

 The term "RELATIVE MAXIMUM AMPLITUDE" means the intensity of the composite waveform. *See* '372 patent, col. 11:39–40. The term "RELATIVE MINIMUM AMPLITUDE" is the background intensity or zero frequency. *Id.* at col. 11:40–41. The phrase "CALCULATING ... FROM THE RELATIVE MAXIMUM ... AND MINIMUM" (Claim 1) is construed to mean that both the relative maximum *and relative minimum* of the red and infrared waveforms must be "mathematically" used in the oxygen saturation calculation. In addition, the Court finds, as Masimo argues, that the minimum must be *part of the composite*, meaning that it must be determined *after* the composite waveform is generated. *See* Masimo Mot. at 12–14, and Reply at 13.

This Court declines to follow Nellcor's construction, which asserts that the maximum and minimum amplitudes are used "at some point in the calculation" of oxygen saturation—not necessarily after the composite is formed. *See* Nellcor Opp. at 17. Doing so would be contrary to the language of the claims and the file history, since both clearly indicate that "the maximum *and* minimum *come from* the composite waveforms," and thus, cannot be used in a calculation prior to the formation of the composite. '372 patent, col. 59: 41–43; *See* Masimo Mot. at 13; Reply at 12.

### a. *Claim Language*

The claim language supports Masimo's construction. The language of the '372 claims require that the minimum must be part of the composite waveform, and must be determined after the composite waveform is generated. *See* 372 col. 59: 40–44

(explaining in Claim 1 that the time measure is processed to collectively determine "a composite waveform *having* a relative maximum and minimum amplitude ... *thereafter* calculating the amount of blood constituent from the relative maximum and minimum amplitude of the composite") (emphasis added).

The strategic placement of the term "thereafter" in the claim demonstrates Nellcor's intent to conduct the calculation after the composite is formed. Further, if the calculation must "use" both the maximum and the minimum, as required by the claim language, then it only makes sense for the calculation to be completed after the formation of the composite, since the composite is composed of the necessary maximum and minimum waveforms.

### b. *File History*

The file history also supports Masimo's construction, in that the Examiner distinguishes the '372 patent from prior art (and specifically the New, Jr. patent), by highlighting that, in the '372 patent, there is a composite waveform "having a relative maximum and minimum", whereas in the New, Jr. patent, there is "no composite signal." *See* Lateef Decl. Ex. 1 at 208. The Examiner further contrasts '372 from New, Jr by explaining that '372 "yields a composite relative maximum and minimum." *See also id.* at 209.

Thus, the Court agrees with Masimo's construction and rejects Nellcor's contention that the relative minimum can be determined and used in the calculation of saturation *before* generating any composite waveform. *See* Masimo Reply at 11.

## II. Infringement

There are two ways a patent can be infringed: literal infringement or infringement under the doctrine of equivalents.

## A. Literal Infringement

 For literal infringement, each element of the claim at issue must be found in the accused product. *See Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed.Cir.1995); *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1038 (Fed.Cir.1992).

### 1. No Literal Infringement

 Given this Court's interpretation of "attenuate and filter" to mean reduce and remove, Masimo cannot infringe Nellcor's '372 patent because this Court finds that Masimo's chirp-z routine does not remove any aperiodic information from the patient signal.

Specifically, this Court does not find literal infringement because Nellcor cannot prove either that Masimo's patent "removes" aperiodic information prior to the calculation, or that Masimo's saturation calculation uses the minimum or zero-frequency component.[4]

## B. Doctrine of Equivalents

### 1. Infringement under the Doctrine of Equivalents

 A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if "every element in the claim is literally or equivalently present in the accused device." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir.1987) (*in banc*). A claim element is equivalently present in an accused device if only "insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424–25 (Fed.Cir.1997) (internal quotations omitted) (explaining the rationale behind the doctrine of equivalents is that it "prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality").

### 2. Limitations to Infringement under the Doctrine of Equivalents

#### a. All Elements Rule

 The all elements rule states that each and every element of the claimed invention must be found in an infringing product. For infringement under the doctrine of equivalents, the same holds true, meaning that there will be no infringement unless each and every claim element, or its equivalent, can be found in the accused product. *See Pennwalt*, 833 F.2d at 935, 939.

Overall similarity is not sufficient if any claim element is entirely missing. *Id.; see also Warner–Jenkinson Co. v. Hilton–Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.").

---

4. Nellcor argues that even if the terms "attenuate and filter" were construed as Masimo *suggests to mean "reduce and remove"*, Masimo would still literally infringe. Nellcor contends that Masimo's technology still meets the claim element because Masimo's technology "remov[es] aperiodic information subsequent to the Fourier transformation" (from time to frequency domain). Nellcor Opp. at 19. Nellcor bases this assertion on the fact that in the frequency domain Masimo's technology "selects" the maximum peaks for the calculation. Nellcor equates this selection of the periodic information to "removal" of the aperiodic information. This Court does not find literal infringement where the processes are not identical. Therefore, Masimo does not literally infringe the '372 patent.

■ Thus, the all elements rule prevents infringement under the doctrine of equivalents where each element is not accounted for either literally or equivalently in the accused device. *See Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 989 (Fed.Cir.1989) (explaining that "elements or steps may be combined without *ipso facto* loss of equivalency").

### b. *Prosecution History Estoppel*

■ A claim for infringement may be barred by prosecution history estoppel when the claimant's prior actions are inconsistent with the claim. In other words, prosecution history estoppel prevents a patent owner from contradicting the prosecution history, by now claiming as "equivalent" subject matter that was given up during prosecution in order to get the patent. *See Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

■ Whether the patentee has surrendered the subject matter is a question of law. *K–2 Corp.,* 191 F.3d at 1368. To determine whether the patentee clearly and unmistakably surrendered the subject matter, the prosecution history must be examined as a whole to determine "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1457 (Fed.Cir.1998) (*en banc* ).

■ Prosecution history estoppel is a legal limitation on the doctrine of equivalents and is properly decided on a motion for summary judgment. *K–2 Corp.,* 191 F.3d at 1366–68.

### 3. No Infringement under the Doctrine of Equivalents

■ In this case, the Court also finds that Masimo's products do not infringe the '372 patent under the doctrine of equivalents.

Nellcor argues that with respect to the claim element of "processing the time-measure collectively ... so that the aperiodic information is attenuated and filtered from the composite," even if one were to determine that Masimo does not literally infringe, Masimo still should be found to infringe under the doctrine of equivalents because Masimo's technology performs "substantially the same function, in substantially the same way, to achieve substantially the same result." Nellcor Opp. at 22. Thus, Nellcor asserts that any differences between the two patents are insubstantial.

Specifically, Nellcor asserts that Masimo's technology (1) performs substantially the same function of "collectively processing a time measure," (2) performs the function is substantially the same way "by taking the Fourier transform" of the time-measure, and (3) achieves substantially the same result: " 'remov[ing]' [5] the aperiodic information from the composite signal through the selection of peaks from the composite periodic waveform." *Id.* at 21–22.

Masimo's technology uses a system whereby important information is "identified" and "selected" for use in the calculation. Diab Decl. at 6–7. No information is removed. *Id.* at 3. For Nellcor's claim to hold true, Nellcor would have to argue that "removal" is equivalent to "identification and selection." However, Nellcor cannot make that argument given Nellcor's prior contentions to the PTO. In prosecuting its '372 patent, Nellcor argued that the

---

**5.** Nellcor uses Masimo's proposed construc- tion in their argument.

prior art was "fundamentally different" from the '372 patent because the prior art did not "attenuate and filter" or remove noise. Lateef Decl., Ex. 1 at 210; *see also* Masimo Mot. 16. Nellcor further argued that the prior art, instead *identified* valid pulses and *used* those pulses in calculating saturation. *Id.*

Nellcor's history of distinguishing its '372 patent from the prior art by claiming that "removal" is different from *identification* and *selection* bars Nellcor from now making the present argument that "selection of signals" in Masimo's technology is equivalent to any potential "removal of noise" in Nellcor's patent.

Nellcor's patent, therefore, requires the removal of aperiodic information. Since the doctrine of equivalents cannot be used to effectively eliminate claim limitations (*Sage Prods., Inc.*, 126 F.3d at 1424–25), this Court finds that Nellcor cannot prove infringement under the doctrine of equivalents.

Although this Court's initial review suggests that Masimo would also be entitled to summary judgment because Nellcor cannot show that Masimo's technology uses the zero-frequency component of the transformed signals in the oxygen saturation calculation, given this Court's finding that Masimo's products do not "attenuate and filter," this Court need not address that issue in detail at this time.

### Nellcor's Rule 56(F) Motion

In Nellcor's Opposition, Nellcor asks for relief under Rule 56(f) to allow discovery relating to the operation of the time domain portions of Masimo's source code. Rule 56(f) grants relief when a party opposing a motion "cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). In such instances, the Court may "refuse the application for judgment or may order a continuance to permit ...

depositions to be taken, or discovery to be had ...." *Id.*

Given that no amount of discovery would allow Nellcor to prove infringement, this Court DENIES Nellcor's request.

### Conclusion

For the foregoing reasons, this Court finds that "attenuate and filter" means "reduce and remove" and that "calculating ... from the relative maximum and minimum" requires both the maximum and minimum amplitudes to be present in the calculation, and requires that the calculation be made after the formation of the composite.

This Court also finds that given these claim constructions, Masimo has not infringed the '372 patent, either literally or through the doctrine of equivalents. Thus, this Court GRANTS Masimo's motion for summary judgment for non-infringement.

Finally, this Court DENIES Nellcor's request for Rule 56(f) relief.

IT IS SO ORDERED